[Cite as *State v. Hill*, 2018-Ohio-4800.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2016-T-0099** |
| DANNY LEE HILL, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas, Case No. 85 CR 317.

Judgment: Affirmed.

*Dennis Watkins,* Trumbull County Prosecutor, and *LuWayne Annos,* Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Sarah Kostick,* 33 N. Stone Avenue, 21st Floor, Tucson, AZ 85701, and *Vicki Ruth Adams Werneke,* Assistant Federal Public Defender, 1660 West Second Street, Suite 750, Cleveland, OH 44113 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Danny Lee Hill, appeals the decisions of the Trumbull County Court of Common Pleas to deny his Motion for New Trial without hearing and to deny his Motion to Disqualify the Office of the Trumbull County Prosecutor. The issues before this court are whether a trial court may strike portions of a motion for new trial based on newly discovered evidence that exceeded the scope of the court's order granting leave to file the motion for new trial; whether the doctrines of

res judicata and law of the case may be applied in analyzing the merits of a motion for new trial; whether a trial court must formally recognize evidence as newly discovered in its analysis of whether the evidence justifies the granting of a motion for new trial; whether an aggravated murder conviction may be sustained based solely on circumstantial evidence; whether a trial court errs in denying a motion for new trial without holding a hearing where the determinative issue turns on the probability of a different outcome at trial in the absence of certain evidence; whether a county prosecutor's office must be disqualified where defendant's former trial counsel takes a position with the office in the absence of actual prejudice; and whether a demonstration of the unreliability of bite mark evidence renders trial proceedings so fundamentally unfair as to deprive a defendant of due process. For the following reasons, we affirm the decision of the court below.

**{¶2}** On November 14, 2014, Hill filed a Request for Leave to File a Motion for New Trial pursuant to Ohio Criminal Rule 33(B). On November 20, 2014, the State filed its Response to Hill's Request, to which Hill filed a Reply on February 12, 2015. On May 14, 2015, Hill filed Supplemental Authority in Relation to his Request for Leave to File a Motion for New Trial.

**{¶3}** On May 22, 2015, Hill filed a Motion to Disqualify the Office of the Trumbull County Prosecutor. On June 16, 2015, the State filed its Response to Hill's Motion to disqualify, to which Hill filed a Reply on July 7, 2015.

**{¶4}** On December 21, 2015, the trial court held an evidentiary hearing on Hill's Request for Leave, at the conclusion of which it orally denied the Motion to Disqualify the Office of the Trumbull County Prosecutor.

**{¶5}** On June 7, 2016, the trial court issued its Order on Petitioner's Request for Leave to File a Motion for New Trial pursuant to Ohio Criminal Rule 33(B). The court noted that on January 31, 1986, after a trial presided over by a three-judge panel, Hill was found guilty of Aggravated Murder in violation of R.C. 2903.01(B) with Specifications for Kidnapping, Rape, and Aggravated Arson (Count #1); Kidnapping in violation of R.C. 2905.01 (Count #2); Rape in violation of R.C. 2907.02 (Count #3); Aggravated Arson in violation of R.C. 2909.02 (Count #4); and Felonious Sexual Penetration in violation of former R.C. 2907.12(A)(1) and (3) (Count #6). The court further noted that, on March 5, 1986, Hill was sentenced to death for Aggravated Murder.[1]

**{¶6}** Hill's convictions are based on the murder of Raymond Fife on September 10, 1985. The factual record is set forth in detail in *State v. Hill*, 11th Dist. Trumbull Nos. 3720 and 3745, 1989 WL 142761 (Nov. 27, 1989), and *State v. Hill*, 64 Ohio St.3d 313, 595 N.E.2d 884 (1992).

**{¶7}** The trial court determined, by clear and convincing evidence, that Hill was unavoidably prevented from filing his Motion for Leave within the one hundred twenty day period provided for by Criminal Rule 33. The court noted that "[t]he crux of Petitioner's argument for leave to file a motion for new trial * * * pivots on the scientific advances in forensic odontology made since 1986 that call into question the reliability of bite mark evidence presented in Hill's trial." In 2013, the American Board of Forensic Odontology established new guidelines for bite mark analysis which could not have been discovered by any amount of due diligence in 1986. Moreover, the court found

---

1. Hill was sentenced to imprisonment for the indeterminate period of ten to twenty-five years for Kidnapping, the determinate period of life for Rape, the indeterminate period of ten to twenty-five years for Aggravated Arson, and the determinate period of life for Felonious Sexual Penetration.

that "the local and state Public Defender's Office had a conflict of interest in preparing and filing the motion for leave for a new trial" resulting in unavoidable further delay.

**{¶8}** On these grounds, the trial court granted Hill leave to file a motion for new trial.

**{¶9}** On June 13, 2016, Hill filed a Motion for New Trial. On July 5, 2016, the State filed its Response, to which Hill filed a Reply on July 19, 2016.

**{¶10}** On June 16, 2016, the State filed a Motion to Strike Defendant's Motion for New Trial. On June 27, 2016, Hill filed a Response

**{¶11}** On September 21, 2016, Hill filed Supplemental Authority and Renewed Motion for Evidentiary Hearing. On September 23, 2016, the State filed its Response, to which Hill filed a Reply on September 26, 2016.

**{¶12}** On October 3, 2016, the trial court issued its Order on Petitioner's Motion for Evidentiary Hearing on Motion for New Trial.

**{¶13}** With respect to the State's Motion to Strike, the trial court found that, in his June 13, 2016 Motion for New Trial, Hill "included issues that were never raised in his prior motion for leave to file a new trial motion." These issues included "the voluntariness of Hill's statements given to the Warren Police Department after the murder of Raymond Fife in 1985" and Dr. Adelman's testimony regarding "the stick or broomstick handle that was introduced by the State at Hill's trial." The court found these additional claims, "unilaterally added by Petitioner in his motion for new trial," to be redundant, impertinent, and immaterial under Civil Rule 12(F). Moreover, the court found "any further discussion of these claims * * * barred by the '*law of the case*' doctrine and '*res judicata*.'" The court ordered these claims stricken.

4

**{¶14}** The trial court then considered whether Hill's newly discovered bite mark evidence, even if contradicting or impeaching prior trial testimony, "can serve as the basis for a new trial in this case," which question turned on "whether the bite mark evidence creates a 'strong probability' that there would be a different outcome in a future trial." Without conducting an evidentiary hearing on the issue, the court concluded that, "even if the bite mark evidence is excluded, considering the totality of the evidence against the Petitioner, particularly on the Kidnapping specification, Petitioner has failed to demonstrate a 'strong probability' that there would be a different outcome if a new trial were granted in this case." In reaching its conclusion, the court noted that the "Ohio Supreme Court thoroughly reviewed the sufficiency of the evidence in this case when it affirmed the Petitioner's convictions," and the "majority of the Court's findings on sufficiency had nothing to do with the bite mark evidence."

**{¶15}** Accordingly, the trial court denied Hill's Motion for New Trial.

**{¶16}** On October 26, 2016, Hill filed a Notice of Appeal. On appeal, Hill raises the following assignments of error.

**{¶17}** "[1.] The trial court committed prejudicial and reversible error when it held it was precluded under the doctrines of *res judicata* and/or 'law of the case' from an independent review of the evidentiary record and/or an independent determination of the merits of Mr. Hill's motion for new trial based on newly discovered evidence, thus denying Mr. Hill due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

**{¶18}** "[2.] The trial court committed prejudicial error when it held that Mr. Hill's new evidence did not satisfy the requirements of *State v. Petro* because the bitemark

5

evidence proffered by Mr. Hill did not create a 'strong probability' of a different result if Mr. Hill is granted a new trial thus denying Mr. Hill due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

{¶19} "[3.] The trial court committed prejudicial and reversible error when it failed to hold that Mr. Hill's bitemark evidence constituted 'new evidence' under Criminal Rule 33 and *State v. Petro* thus denying Mr. Hill due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

{¶20} "[4.] The trial court committed prejudicial and reversible error when it granted the State's Rule 12 motion to strike Mr. Hill's non-bitemark evidence based on an erroneous interpretation of *State v. Petro* and/or an inappropriate application of 'law of the case' and/or *res judicata* thus denying Mr. Hill due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

{¶21} "[5.] The trial court committed prejudicial and reversible error when it failed to conduct an evidentiary hearing before denying Mr. Hill's motion thus denying Mr. Hill due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

{¶22} "[6.] The trial court abused its discretion by not granting Mr. Hill's motion to disqualify the Trumbull County Prosecutor thus denying Mr. Hill due process of law in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution."

{¶23} "[7.] The trial court committed prejudicial and reversible error when it failed to consider and rule on Mr. Hill's argument that the fabricated expert evidence at his trial constituted a violation of his Eighth and Fourteenth Amendment rights."

**{¶24}** When considering an untimely motion for new trial based on newly discovered evidence, a trial court is required to engage in a "two-step process," first determining whether the motion should be allowed and then considering the merits thereof. *State v. Elersic*, 11th Dist. Geauga No. 2006-G-2740, 2007-Ohio-3371, ¶ 23.

**{¶25}** With respect to the timeliness requirement, the Rules of Criminal Procedure provide:

> Motions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period.

Crim.R. 33(B).

**{¶26}** With respect to the merits of a motion for new trial, Criminal Rule 33 provides:

> A new trial may be granted on motion of the defendant * * * [w]hen new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must

7

produce at the hearing on the motion, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given, and if time is required by the defendant to procure such affidavits, the court may postpone the hearing of the motion for such length of time as is reasonable under all the circumstances of the case. The prosecuting attorney may produce affidavits or other evidence to impeach the affidavits of such witnesses.

Crim.R. 33(A)(6).

{¶27} "To warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Hawkins*, 66 Ohio St.3d 339, 350, 612 N.E.2d 1227 (1993), citing *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

{¶28} Moreover, a "trial court would only need to consider whether the evidence is, in fact, 'newly discovered' if it finds that appellant 'had no knowledge of the existence of the ground supporting the motion and could not have learned of that existence within the time prescribed for filing the motion in the exercise of reasonable diligence.'" (Citation omitted.) *State v. Trimble*, 2015-Ohio-942, 30 N.E.3d 222, ¶ 19 (11th Dist.).

{¶29} "The allowance of a motion for a new trial on the grounds of newly discovered evidence is within the competence and discretion of the trial judge; and in

8

the absence of a clear showing of abuse such decision will not be disturbed." *State v. Williams*, 43 Ohio St.2d 88, 330 N.E.2d 891 (1975), paragraph two of the syllabus; *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990), paragraph one of the syllabus.

**{¶30}** Hill's assignments of error will be considered out of order.

**{¶31}** In the fourth assignment of error, Hill contends that the trial court erred in applying Civil Rule 12(F) to strike portions of his Motion for New Trial.

**{¶32}** Civil Rule 12(F) provides: "Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within twenty-eight days after the service of the pleading upon him or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient claim or defense or any redundant, immaterial, impertinent, or scandalous matter."

**{¶33}** Hill notes that the "trial court cited no authority for applying Civil Rule 12(F) in a criminal context." Appellant's brief at 41. On the contrary, the trial court cited to Criminal Rule 57(B) which provides: "If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules of criminal procedure, and shall look to the rules of civil procedure and to the applicable law if no rule of criminal procedure exists." *Compare State v. Schlee*, 117 Ohio St.3d 153, 2008-Ohio-545, 882 N.E.2d 431, ¶ 10 ("the plain language of Crim.R. 57(B) permits a trial court in a criminal case to look to the Rules of Civil Procedure for guidance when no applicable Rule of Criminal Procedure exists"); *Elersic*, 2007-Ohio-3371, at ¶ 23 (Criminal Rule 33 "does not specify the procedure by which the initial order is to be obtained"). The court also cited precedent for striking a reply brief when it was not filed

by rule or with leave of the court. *State ex rel. Ebbing v. Ricketts*, 133 Ohio St.3d 339, 2012-Ohio-4699, 978 N.E.2d 188, ¶ 15.

**{¶34}** In the present case, the trial court granted the State's Motion to Strike to the extent that Hill's Motion for New Trial included material supporting additional claims beyond the scope of Hill's Motion for Leave, which was "limited * * * to the issue of the scientific reliability of bite mark evidence based upon the scientific advances in [the] field of forensic dentistry and the 2013 ABFO guidelines." These materials included the affidavits of Dr. Zhongxue Hua (challenging the opinions of pathologist Dr. Howard Adelman regarding the victim's injuries), Dr. Stephen Greenspan (challenging opinions proffered in the course of proceedings on Hill's *Atkins* petition), and Dr. Deborah Davis (opining that "little weight should be given to [Hill's] confession[2] as evidence of guilt").

**{¶35}** The trial court understood that it had granted Hill leave to file his Motion for a New Trial only on the basis of bite mark evidence. This conclusion is hardly controversial given that Hill's Request for Leave only referenced and/or discussed bite mark evidence. *See* pages 11 to 13 of the Request for Leave discussing "newly discovered evidence" and "due diligence." Moreover, at the evidentiary hearing held on the Request for Leave, Hill's two witnesses only discussed the bite mark evidence. Accordingly, we reject Hill's argument that there was "an absence of any formal direction to Mr. Hill that he must confine his motion for new trial solely to bite mark issues." Appellant's brief at 43. The trial court could not be expected to grant leave beyond what was formally sought and argued for by Hill.

---

2. As a practical matter, Hill never confessed to inflicting any harm to the victim but, rather, made incriminating/inculpatory statements.

10

{¶36} Hill also contends that the affidavits in question are "new" inasmuch as "[n]either Dr. Hua nor Dr. Davis have previously testified on behalf of Mr. Hill" and "[n]o court has ever ruled on the admissibility or inadmissibility of their testimony." Appellant's brief at 43. Hill's argument fails to appreciate that the crucial issue is whether there was unavoidable delay in obtaining their testimony. Dr. Hua's affidavit essentially concedes that his opinions are not based on any advances in scientific knowledge. He states: "At no point, ***including at the time the opinions were proffered in 1985-86 or today***, has there been a reliable scientific basis for Dr. Adelman's testimony regarding the nature of the wounds to Raymond Fife's rectum, or any object purportedly used to create those wounds."[3] Dr. Davis offers nothing more than her opinion that "Danny Hill's confession was highly unreliable" based "on the evidence surrounding the interrogations themselves and Danny's personal characteristics."

{¶37} Nothing about these affidavits suggests that Hill could not have learned of the existence of the grounds for their testimony in the exercise of reasonable diligence. On the contrary, the grounds for Hua's and Davis' testimony were expressly acknowledged at the time of trial. At trial, counsel for Hill spoke derisively of Dr. Adelman's testimony identifying the stick that was used to sodomize Fife:

> This must be the stick! So, they submit it, and at a point in time * *
>
> * Mr. Adelman comes up with the conclusion this could be the stick.

---

3. Dr. Hua also challenged the validity of Dr. Adelman's trial testimony regarding asphyxia and erection. As this testimony pertained to the bitemark evidence on which the Request for Leave was granted, it should have been and in fact was considered by the trial court in ruling on the merits of the Motion for New Trial. The court stated: "The Petitioner submitted an affidavit from Dr. Zhongxue Hua. Dr. Hua criticized the testimony of Dr. Adelman and Dr. Mertz and concluded that there was no scientific basis to support their conclusions that Fife's penis was erect at the time the patterned injuries occurred."

11

Well, he's assuming, first off, it's a stick or piece of wood of some sort, okay, evidentally [sic], from the plant material later on, but he assumes it's the stick. So, he shows sections and everything else, and yeah, it could have caused that. You could have taken any broom handle, anything; implement handle, anything, split it, crack it like it usually does like that, and it probably would have fit also. The prosecutor's got this wonderful stick. This is evidence. Boy! That is great!

**{¶38}** Similarly, many of the salient points raised by Dr. Davis were previously raised by trial counsel. He emphasized that Hill had been placed in classes for the educable mentally retarded since the first grade. Counsel also suggested that the officers and detectives were fully aware of Hill's diminished capacity and intentionally interrogated Hill before his more intellectually competent co-principal, Timothy Combs, because "they know damn well how basically stupid Danny is and they could break him down." Both Davis and trial counsel describe Hill's statements as being the product of manipulative interrogation techniques and inherently unreliable.

**{¶39}** In the absence of any evidence that Hill was unavoidably delayed in obtaining the testimony of Drs. Hua and Davis, their testimony was properly struck from consideration by the trial court as the court could not have properly considered its merits. *Trimble*, 2015-Ohio-942, 30 N.E.3d 222, at ¶ 12 ("[a] trial court may not consider the merits of the motion for a new trial until it makes a finding of unavoidable delay"); *State v. Rodriguez-Baron*, 7th Dist. Mahoning No. 12-MA-44, 2012-Ohio-5360, ¶ 11 ("[l]eave of court must be granted before the merits of the motion are reached").

{¶40} Hill also objects to the trial court's reference to res judicata and the law of the case doctrine as barring further discussion of the issues raised by Drs. Hua and Davis. For the law of the case doctrine, *see Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984) ("the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels"); for res judicata, *see State v. Szefcyk*, 77 Ohio St.3d 93, 671 N.E.2d 233 (1996), syllabus ("a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment").

{¶41} We note, however, that, where leave to file a motion for new trial is based on issues that could have been raised on direct appeal the doctrine of res judicata is properly invoked to deny leave. *State v. Shuster*, 5th Dist. Morgan No. 16AP0012, 2017-Ohio-2776, ¶ 18 (cases cited).

{¶42} The fourth assignment of error is without merit.

{¶43} In his first assignment of error, Hill contends that the trial court erred in its application of res judicata and the law of the case doctrine as a way of excusing itself "from engaging in an independent re-examination of the new evidence and evidentiary record as required by Criminal Rule 33 and *State v. Petro*." Since "the trial court's denial of Mr. Hill's motion rests upon its finding of preclusion, * * * its Order must be reversed." Appellant's brief at 11-12.

**{¶44}** The trial court invoked the law of the case doctrine and res judicata to establish the following as binding: "[t]he Ohio Supreme Court independently weighed all of the trial evidence and found that Petitioner's conviction for Aggravated Murder and the rape specification, as well [as] the kidnapping and aggravated arson specifications, were supported by evidence beyond a reasonable doubt." We disagree, however, that the court based its denial of Hill's Motion for New Trial solely on the Supreme Court's determination that there was sufficient evidence to support Hill's convictions.

**{¶45}** The trial court did independently consider whether the bite mark evidence satisfied the standard set by *Petro*, in particular whether the evidence disclosed a "strong probability" that it would change the outcome if a new trial were granted, albeit not doing so "in a jurisprudential vacuum." The court appealed to prior judicial review of the evidence to convict Hill to support its own conclusion that Hill's convictions could stand independently of the bite mark evidence.

**{¶46}** The trial court frankly acknowledged that "[t]he granting of a new trial based on newly discovered evidence by its obvious terms involves consideration of newly discovered evidence." The court noted the "relevancy of bite-mark testimony [as] a factor in proving whether Hill's mouth came into contact with the victim's penis," but "had no relevance on the question of whether Hill had anal intercourse with Fife." Similarly, "the bite mark evidence does nothing to vitiate the sufficiency of the overwhelming evidence against the Petition on the Kidnapping specification to the Aggravated Murder count," and the same could be said of the Aggravated Arson charge. The court's appeal to the Supreme Court's review of the evidence is used to support its conclusion that Hill's convictions remain valid even in the absence of the bite

14

mark evidence, rather than the proposition that consideration of Hill's evidence is foreclosed. Hill may certainly disagree with the court's conclusion regarding the significance of the bite mark evidence to his convictions, but this does not render the court's invocation of res judicata and the law of the case doctrine reversible error per se.

{¶47} The first assignment of error is without merit.

{¶48} In the third assignment of error, Hill faults the trial court for "never formally acknowledg[ing] that Mr. Hill's bitemark evidence constituted new evidence pursuant to Criminal Rule 33." Appellant's brief at 26.

{¶49} Hill's argument is undermined by the trial court's own statements acknowledging that the bite mark evidence is newly discovered evidence. *See*, *e.g.*, "this Court, in its discretion granted leave to Petitioner to file a motion for new trial, finding that the Petitioner was 'unavoidably prevented' from discovering new evidence relating to 'bite mark' evidence that was not in existence at the time of Petitioner's trial," and "[t]he *sole basis* of Petitioner's motion for leave to file a motion for a new trial is predicated on 'newly discovered' bite mark evidence that did not exist in 1985." Moreover, the court subjected Hill's bite mark evidence to the *Petro* analysis, which action would be nonsensical unless the evidence was considered newly discovered evidence.

{¶50} The third assignment of error is without merit.

{¶51} In the second assignment of error, Hill challenges the trial court's decision to deny his Motion for New Trial on the grounds that, "even if the bite mark evidence is excluded, considering the totality of the evidence against the Petitioner, particularly on the Kidnapping specification, Petitioner has failed to demonstrate a 'strong probability'

15

that there would be a different outcome if a new trial were granted in this case." Hill counters that, in the absence of the bite mark evidence, "there existed *no other direct evidence* supporting Mr. Hill's active involvement in those specific crimes." Appellant's brief at 22. Thus, the court could not simply assume, based on the sufficiency of the non-bite mark evidence, that the results of Hill's trial would have been the same. According to Hill, "the bitemark was essential to showing that [he] was an active participant, not a passive accomplice." Appellant's brief at 24.

{¶52} Before considering the trial evidence, it should be emphasized that "[c]ircumstantial evidence and direct evidence inherently possess the same probative value," and that, "[w]hen the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. It follows that "circumstantial evidence alone may be sufficient to support a conviction for murder." *State v. Nicely*, 39 Ohio St.3d 147, 529 N.E.2d 1236 (1988), paragraph one of the syllabus.

{¶53} It should also be recognized that: "It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." (Citation omitted.) *State v. Williams*, 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997); *State v. Wagner*, 8th Dist. Cuyahoga No. 48433, 1985 WL 7448, *2 (Jan. 17, 1985) ("Ohio law is clear that evidence of flight from the scene of a crime may be considered as some evidence of guilt").

16

**{¶54}** Similarly, exculpatory statements, "when shown to be false or misleading, are circumstantial evidence of guilty consciousness and have independent probative value." (Citation omitted.) *State v. Thompson*, 10th Dist. Franklin No. 05AP-1268, 2006-Ohio-3440, ¶ 21; *Wilson v. United States*, 162 U.S. 613, 620-621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896) ("if the jury were satisfied, from the evidence, that false statements in the case were made by defendant * * *, they had the right * * * to regard false statements in explanation or defense, made or procured to be made, as in themselves tending to show guilt").

**{¶55}** Turning to the evidence at trial, it cannot be reasonably doubted that Hill was present during the kidnapping, assault, rape, and burning of Fife. The issue, then, is whether there was evidence from which Hill's participation in the kidnapping, assault, rape, and burning of Fife may be inferred. Finally, we must consider whether there was a strong probability of Hill's convictions in the absence of the bite mark evidence.[4]

**{¶56}** The testimony from the following witnesses established Hill's presence with Combs at the scene of the crime both before and after the attack:

**{¶57}** Matthew Hunter, a student at Warren Western Reserve on September 10, 1985, saw Hill and Combs together while he was cutting grass for a neighbor on Jackson Street at about 3:00 p.m. Later that afternoon, around 5:00 p.m., Hunter took a trail through a wooded area from Jackson Street to the Valu-King on Palmyra Road. At this time, Hunter saw Hill and Combs "in the parking lot coming towards the store." Hunter went into the store to purchase cookies and juice. Upon exiting, he saw Hill and Combs standing in front of a Laundromat connected to the Valu-King. After passing by

---

4. The focus is not whether the bite mark evidence contributed to Hill's convictions, which it certainly did, but, rather, was there a strong probability of conviction had such evidence not been presented.

17

Hill and Combs, Hunter saw "Raymond Fife coming in the parking lot off Palmyra Road" on a bike. Hunter described the bike as "a small dirt bike," red with "knobby tires." Hunter re-entered the woods and returned home.

{¶58} Darren Ball, a student at Warren Western Reserve at the time, was walking home with a friend, Troy Cree, after football practice at about 5:30 p.m. From Willow Drive, they entered a trail leading through a field/woods toward the Valu-King. They met Combs on the trail "coming from the Valu-King." After acknowledging Combs, they jogged for about twenty seconds to the end of the trail where they heard a child's scream "like somebody needed help or something." Ball explained that they began to jog because Combs is "a fag" and "does it on boys." Upon hearing the scream, Ball turned around but did not see Combs.

{¶59} Cree likewise recalled passing Combs on the trail and hearing a child scream about thirty seconds later.

{¶60} Donald Allgood, a student at Warren Western Reserve, was walking on Willow Drive around 5:30, 6:00 p.m. and saw Hill, Combs, Andre McCain, and one other person "walking out of the field coming from Valu-King." From Willow, they turned north on Hemlock Avenue. Allgood observed that Hill "with a little flick of his wrist * * * threw a stick to his right." Allgood estimated the stick to be about twelve inches long. Allgood noted that Combs was pulling up his zipper and held his head down.

{¶61} Raymond Fife was found that evening by his father in the wooded area behind the Valu-King.

{¶62} On September 12, 1985, the day that Fife died from his injuries, Hill came to the Warren Police Department claiming to have "some information about that boy that

18

was beat up." At this point, Hill had not been contacted by the police in connection with the crime. Hill spoke with Sergeant Thomas Stewart and offered that he had seen a person named Reecie Lowry riding Fife's bike. Hill correctly described the bike as a reddish dirt bike with knob wheels. Hill could not explain how he knew it was Fife's bike. When asked if Lowry still had the bike, Hill replied that Lowry probably had put the bike back in the field where Fife was attacked (and where the bike was found the next day). Hill also mentioned seeing Lowry together with Andre McCain. Another detail of the attack mentioned by Hill was Fife had been choked with underwear.

{¶63} Earlier that day, the police had learned from Cree that Combs had been in the woods behind the Valu-King at the time of the attack (as noted above, neither Cree nor Ball had seen Hill or Fife although they had heard a child's scream). Since Combs was a suspect, Sergeant Stewart mentioned his name. Hill responded by suggesting that Combs "could have done it," since he "likes to * * * mess with [white boys] in the butt." However, Hill denied seeing Combs since Combs had been released from "the joint."

{¶64} On September 13, 1985, Hill was interviewed by Detective Dennis Steinbeck. Hill claimed that, on September 10, he was at home sleeping until 7:00 p.m. Hill repeated his statements that he had seen Lowry on Fife's bike on a couple of occasions since the attack; he had not seen Combs since he had gone to jail; and he was not present at the Palmyra Road Valu-King.

{¶65} Hill's initial statements to the police are indicative of his guilt for several reasons. In them, he tried to implicate persons in the crime who were not found to have any connection with the crime. Hill also misled the police about his own involvement by

19

denying his presence at the crime scene and his association with the other principal convicted for murdering Fife.

**{¶66}** On September 16, 1985, Hill was brought to the police station by Detectives Steinbeck and Morris Hill (Danny's uncle). Hill consented to conduct recorded interviews, one audio and the other video. Hill admitted that he was with Combs when Fife was attacked but denied participating. Hill's statements during the interviews were generally inconsistent and incoherent. Hill claimed it was Combs' idea to attack Fife in order to take his bike. Hill described the attack in some detail. Some details were corroborated by other evidence and some details were demonstrably false. Some details were suggested by police officers and some Hill proffered of his own accord. Hill's description of the attack also varied as he told it. For example, when asked by the police Hill affirmed in both the audio and video interviews that Fife vomited during the assault, a detail confirmed by emergency personnel.[5] However, in the audio interview Fife vomited because Combs had smashed his head against the bike pedal while in the video interview Fife vomited because Combs was abusing his genitals.

**{¶67}** Hill's account of his own behavior during the assault was similarly inconsistent. At one point, Hill remained by the Valu-King and watched the attack from a distance. At another point, Hill was only a few feet from the attack. At another point, Hill had taken a board with the intent of hitting Combs with it. At another point, Hill was left alone with Fife while Combs went to Valu-King.

**{¶68}** While much of Hill's testimony is of doubtful veracity, Hill betrays his guilt by making several statements which were not suggested by police, were contradicted

---

5. EMT Raleigh Hughes spoke with Fife's father who described his son as "engulfed with vomit" and having "vomited all over himself." Hughes himself did not observe any vomit as the father wiped it off prior to his arrival.

by other evidence or were of an incredible nature, and served to deflect blame away from him.

{¶69} Hill consistently testified that, after the attack, he chased and/or followed Combs out of the field onto Jackson Street, despite the police suggesting that they exited onto Willow Drive as witnessed by Allgood. It was necessary for the otherwise suggestible Hill to deny being seen exiting onto Willow Drive because Allgood, in addition to seeing him in Combs' company, testified that Hill possessed a stick matching the description of the stick used to sodomize Fife.

{¶70} Dr. Adelman testified that one of Fife's several mortal injuries was "the penetration and perforation of the rectum and the urinary bladder." He described two wounds in particular, a contusion in the rectum and a penetration into the urinary bladder through the rectum. Dr. Adelman was able to identify the presence of plant cells in the injured areas of the rectum and bladder.

{¶71} Allgood testified that he observed Hill throw a stick about twelve inches long back into the woods. During the September 16 interviews, Hill described a stick which he claimed Combs used to sodomize Fife as "like a broom handle thing * * * but some of it was broke"; "it had ridged ends like and the other end wasn't ridged, it had like a round -- it was like a round head." After Combs had finished "grind[ing] it in his butt," Hill "didn't see the stick no more" because Combs "must of just threw it."

{¶72} Notably, Hill advised the police that the stick would not or could not be found. Hill suggested that a garbage man might have come and taken the stick, insisting, despite police incredulity, that "they come back there to pick up the garbage."

Hill added that Combs might have returned and picked up the stick and, alternatively, that Combs was looking for the stick the next day but was unable to find it.

{¶73} On the same day that Hill was providing these statements to the police, Officer James Teeple was searching the area near Willow Drive where Allgood had seen Hill throw the stick (Allgood had been taken to the scene and pointed out the specific area police officers). Teeple found a stick matching Hill's (yet unknown) description - a broken broom handle - about six feet from the path. Teeple focused on this particular stick because in size it matched Allgood's description and because "it appeared to have been freshly put": "All the other sticks were under grass, were covered with moss, were securely attached or growing there. It looked like a broom handle and * * * was not covered with any moss or it was not dirty, it wasn't grown with weeds."

{¶74} Although no blood or other physical evidence linking it to Fife was found on the stick, the inference remains reasonable that it was the stick involved and it was in Hill's possession as he exited the path. Even without this inference, Allgood's testimony remains that Hill exited the trail holding a twelve inch stick and a stick of that size is consistent with the injuries to Fife's rectum and bladder.

{¶75} Hill's own testimony also implicates him. Hunter testified that Hill and Combs were standing near Valu-King when Fife was approaching the parking lot. Hill claimed that Combs wanted Fife's bike and went after Fife for that purpose. Hill continued that Combs wanted him to help but he refused. Combs then went into the field several hundred feet distant while Hill remained by the building. From this position, Hill claimed he saw Combs knock Fife off the bike, strip Fife, begin to strangle him, and

22

throw him to the ground. In the course of describing the events of the attack, Hill's position changes to within ten feet of the events he is describing, close enough that Fife, in Hill's words, "was looking at me, like he wanted me to come over there and get him." Hill's explanations as to how he came to join Combs in the woods are risible, as he variously describes hiding in the bushes and/or attempting to sneak up on Combs with a board to hit him. No factfinder would be bound to accept Hill's proffered reasons as to how he came to be present in the woods where Fife was attacked. And any rational factfinder would be justified in inferring from Hill's proffered nonsense that his real motivation and reason for accompanying Combs was to participate in Fife's rape, beating, strangulation, burning, and, ultimately, murder.

**{¶76}** There are other aspects of Hill's statements to the police that support his convictions. Hill was asked why he never attempted to contact the police, intervene in the attack, or seek medical help for Fife after the attack. Hill explained: "If I would have ran and tried to find my uncle [Detective Morris] or you or one of you all, tell one of you all -- his mother don't like me anyway. She would have found him down here, he would have went home and told his mother that I was the one that did it, and she would have followed him down here and said that she probably know that I would do something like that." While theoretically possible, the more reasonable inference is that Hill failed to report the crime because he committed the crime.

**{¶77}** Such examples could be multiplied. As a final point, it is worth noting that Hill admits he was left alone with Fife. According to Hill's statements, Combs left the scene to obtain a stick and/or lighter fluid used to sodomize and/or burn Fife respectively. There is some corroboration for this fact in the testimony of Ball and Cree

23

who encountered Combs alone on the trail but who did not see either Hill or Fife, whose testimony also suggests that Combs may have been serving as a lookout for Hill. Whether Combs was looking for a stick or serving as lookout, the fact remains that Combs trusted Hill to be left alone with Fife from which the obvious implication may be inferred.

{¶78} Raymond Vaughn, Hill's brother, testified that on the evening of September 20, 1985, Hill was washing a pair of pants in the bathtub (the family did not have an automatic washer) that were stained with something red that "looked like blood." Vaughn saw Hill wash the same pair of pants on two successive nights.[6]

{¶79} The State also presented testimony pursuant to Evid.R. 404(B) and R.C. 2945.59 for the purpose of showing motive, plan, and identity of the defendant. *Hill*, 64 Ohio St.3d at 322, 595 N.E.2d 884. Candyce Jenkins testified that, in 1984, Hill anally raped and bit her during an attack in which he also threatened to sodomize her with a knife.[7] Mary Ann Brison testified that, in 1984, Hill raped her in the woods behind the Valu-King. Stephen Melius testified that, in 1984, he was in juvenile detention with Hill and that Hill importuned him to engage in homosexual acts.

{¶80} The foregoing evidence fairly supports the trial court's conclusion, "[e]ven if this Court were to conclude based on today's advance in forensic odontology and the ABFO guidelines, that the bite-mark evidence is unreliable and could not be introduced

---

6. Hill contends Vaughn's testimony has little probative value because he recanted following trial. Reply brief at 28. Although Vaughn subsequently claimed his testimony was coerced, he also testified that he first confided his observations to his grandmother at the time Hill was arrested – prior to any possible coercion.

7. Hill maintains that Jenkins' testimony would have been inadmissible without the bite mark evidence but this is doubtful. Jenkins' testimony was nonetheless indicative of motive, plan, and identity inasmuch as Hill raped her anally, demonstrated a delight in inflicting pain, threatened sodomy with an inanimate object, and, according to Hill's own statement, disposed of evidence following the rape in the woods behind Valu-King where Fife was attacked.

in a future trial, there is no probability, much less a strong probability that a new trial would result in a different outcome." That Hill was present during the attack cannot be seriously questioned. The issue is whether his active participation can be inferred from his efforts to conceal his involvement and to place the blame on others. Such an inference is legally permissible and, given the facts of the present case, compelling. *Compare State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218, ¶ 40 (10th Dist.) (finding the following facts "more than enough for a jury to directly or circumstantially find defendant guilty of aggravated murder while committing an aggravated robbery": "[t]he state's witnesses linked defendant to procurement of the alleged murder weapon, placed defendant at the scene of the crime with the weapon, proximally connected defendant and the only other possible shooter to the victim at the time of the fatal gunshot, and associated defendant with property last seen on the victim's person").

{¶81} Although the foregoing analysis focuses on the sixth *Petro* factor, the trial court noted without elaboration that "[t]here is no question that the advancements in forensic odontology impeach and contradict the trial testimony of the experts." Further considering this *Petro* factor, it is noteworthy that Hill's trial counsel raised many of the same arguments advanced by Hill as newly discovered evidence, albeit without the endorsement of expert witnesses. Hill's bite-mark evidence is to a degree cumulative. For example, regarding the bite mark testimony, Hill's trial counsel emphasized that the two experts who testified at trial contradicted each other to such a degree that the reliability of the expertise itself was called into question:

25

[I]f these are the giants; maybe the top two or third, fourth best * * *, if that's what we've got here and they disagree, what does that make the state of the evidence? How can you consider that? * * * You got the two best supposedly, or at least Mr. Levine, I would say, is better, but you got two experienced people, and they give different opinions. Mr. Levine also said that it could be caused by -- he ruled out Mr. Combs because he didn't see any fractured teeth. Of course, he said it could be caused by any person. In other words, the characteristics aren't that great that he would pin it down to anybody. Just a fractured tooth, maybe. So, what do we have? We don't have proof beyond a reasonable doubt involved in the tooth mark, and that's the only thing that really ties Danny in.

{¶82} Conversely, the prosecutor at trial made the point during closing arguments that the bite mark evidence was not at all necessary to convict Hill:

[T]he other important factors in the evidence in this case and in --- especially through the pathologist, is that we know that no one person could have done all these things, and Danny Lee Hill knew that also. And this is a key. For example, when you listen to the tapes and the video cassette about knocking the boy off the bike and then removing the bike to hide it in the woods, how could one person take care of the little boy and get rid of the bike? And that makes more sense when we look at Danny Lee Hill himself; the fact that he came to the police station. Why? We know that he was

26

trying to take the blame from himself; to place the heat somewhere else. And he mentions two individuals by the name of Lowry and McCain. Talks about shorts. He talks about the bike that he saw Maurice Lowry on which he later admits were not true. But why, when he homes in to blame somebody initially, does he blame two people? Reason and common sense. That's all this case takes to realize that -- you don't even need two experts to say his teeth marks were on this little boy's penis -- he's guilty.

**{¶83}** The second assignment of error is without merit.

**{¶84}** In the fifth assignment of error, Hill contends that the trial court abused its discretion by denying his Motion for New Trial without holding an evidentiary hearing. "In light of the trial court's inexperience with the facts of Mr. Hill's trial, its attempt to avoid independent analysis in favor of inapplicable theories of preclusion, and its repeated mischaracterization of the trial and appellate court records, an evidentiary hearing was, at a minimum, necessary." Appellant's brief at 53.

**{¶85}** Criminal Rule 33 does not require a hearing on a motion for new trial and the decision to conduct a hearing lies within the sound discretion of the trial court. *State v. White*, 8th Dist. Cuyahoga No. 105430, 2017-Ohio-6984, ¶ 28.

**{¶86}** We find no abuse of discretion in the trial court's decision not to hold a hearing on the Motion for New Trial. The court did not question the validity of Hill's bite mark evidence and proceeded on the assumption that his evidence would have precluded the admission of the State's evidence at trial. The court then considered whether the absence of bite mark evidence would have been outcome determinative.

27

*Hill*, 64 Ohio St.3d at 333, 595 N.E.2d 884 (finding no abuse of discretion in the failure to hold a hearing where, even considering the newly discovered evidence, "the result of the defendant's trial would not have been different").

{¶87} The fifth assignment of error is without merit.

{¶88} In the sixth assignment of error, Hill argues that the trial court erred by denying his Motion to Disqualify the Office of the Trumbull County Prosecutor.

{¶89} With respect to motions for disqualification, the Ohio Supreme Court has established the following test:

{¶90} In ruling on a motion for disqualification of either an individual (primary disqualification) or the entire firm (imputed disqualification) when an attorney has left a law firm and joined a firm representing the opposing party, a court must hold an evidentiary hearing and issue findings of fact using a three-part analysis:

> (1) Is there a substantial relationship between the matter at issue and the matter of the former firm's prior representation;
>
> (2) If there is a substantial relationship between these matters, is the presumption of shared confidences within the former firm rebutted by evidence that the attorney had no personal contact with or knowledge of the related matter; and
>
> (3) If the attorney did have personal contact with or knowledge of the related matter, did the new law firm erect adequate and timely screens to rebut a presumption of shared confidences with the new firm so as to avoid imputed disqualification?

28

*Kala v. Aluminum Smelting & Refining Co, Inc.*, 81 Ohio St.3d 1, 688 N.E.2d 258 (1998), syllabus.

**{¶91}** When the motion for disqualification is directed against the entire prosecutor's office, however, Ohio courts of appeals have consistently held that the mere appearance of impropriety is insufficient to merit disqualification, and that there must be evidence of an actual breach of confidence resulting in prejudice to the defendant. *State v. Bachman*, 5th Dist. Stark No. 2014CA00198, 2015-Ohio-2054, ¶ 24 (cases cited).

**{¶92}** Hill maintains that a conflict of interest exists as the result of his trial counsel, James Lewis, being hired by the prosecutor's office in January 2013, following his retirement from the Trumbull County Public Defender. Hill maintains this "creates a real and significant conflict of interest that, by itself, warrants disqualification of the office." Appellant's brief at 54.

**{¶93}** Any presumption of shared confidences that may exist by virtue of the fact that Attorney Lewis began working for the county prosecutor's office were effectively rebutted by the following considerations. Lewis represented Hill from 1985 to 1986, but was not hired by the prosecutor's office until 2013. According to the State, Lewis was hired for a part-time position in the child support division and "has had no input in any felony case * * * includ[ing] any postconviction litigation or appeal filed by [Hill]." Hill's Motion to Disqualify was filed in May 2015, almost thirty years after Lewis' representation of Hill had terminated and was filed in connection with a Motion for New Trial based on newly discovered evidence, i.e., evidence discovered after Lewis' representation of Hill had ceased.

29

**{¶94}** Hill has proffered no evidence of an actual breach of confidence resulting from Attorney Lewis' employment by the prosecutor's office. Rather, Hill relies upon "the proposition that a presumption of shared confidences–and thus a conflict of interest–exists where a defendant's counsel later joins the prosecutor's office trying defendant's case." Reply brief at 39. The cases cited by Hill fail to substantiate this claim. *See Bachman*, 2015-Ohio-2054, at ¶ 24 ("[a] decree disqualifying the prosecutor's office should only be issued by a court when actual prejudice is demonstrated"); *State v. Richardson*, 2014-Ohio-3541, 17 N.E.3d 644, ¶ 32 (3d Dist.) ("the mere appearance of impropriety in a government office is not sufficient, in and of itself, to warrant disqualification of the entire office") (citation omitted).

**{¶95}** Hill also claims disqualification is merited on account of Attorney Lewis hiring Hill's uncle, Detective Morris Hill, as an investigator with the public defender's office and Fife's mother, Miriam Fife's, employment by the prosecutor's office as a victim's advocate. This court notes that neither Hill's uncle nor Fife's mother are attorneys and thus their employments, either past or present, have no bearing on whether the prosecutor's office should be disqualified under the framework established by *Kala*.

**{¶96}** The sixth assignment of error is without merit.

**{¶97}** In the seventh and final assignment of error, Hill maintains that bite mark testimony of Dr. Curtis Mertz, who testified on behalf of the State at trial, "was so contrary to science and logic, and so demonstrably false, that it should be treated as pure fabrication." Appellant's brief at 57. Hill relies on the case of *Ege v. Yukins*, 485 F.3d 364 (6th Cir.2007), in which the federal court granted habeas relief on the grounds

30

the bite mark evidence ("Dr. Warnick's statement that among the 3.5 million residents of the Detroit metropolitan area, Ege's teeth, and *only* Ege's teeth, could have made the mark on Thompson's cheek") was so egregiously prejudicial as to constitute the denial of fundamental fairness at trial. *Id.* at 375-376.

**{¶98}** *Ege* is readily distinguishable. Unlike the present case, in *Ege* "none of [the State's non-bite mark evidence] placed Ege at the scene of Thompson's murder." *Id.* at 377. On the other hand, the *Ege* court recognized that, "[o]bviously, many cases are tried on nonphysical circumstantial evidence alone, and in many cases this circumstantial evidence overwhelmingly points toward the defendant's guilt." *Id.* Hill's is such a case.

**{¶99}** The seventh assignment of error is without merit.

**{¶100}** For the foregoing reasons, the decision of the Trumbull County Court of Common Pleas to deny Hill's Motion for New Trial without hearing and to deny his Motion to Disqualify the Office of the Trumbull County Prosecutor is affirmed. Costs to be taxed against appellant.


THOMAS R. WRIGHT, P.J., concurs in judgment only,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.


_____


COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.


31

**{¶101}** Based on the decision in *Hill v. Anderson*, 881 F.3d 483 (6th Cir.2018), I would dismiss the instant appeal as moot. In that case, the United States District Court for the Northern District of Ohio had dismissed Hill's petition for habeas corpus, which was premised on the contention that his low intelligence prevents the death penalty from being applied to him; ineffective assistance of trial counsel; prosecutorial misconduct; and violation of his due process rights. *Id.* at 486-487. On appeal, the Sixth Circuit affirmed the judgment of the district court regarding the last three claims, but reversed and remanded for the district court to grant Hill's petition on his claim his low intelligence prevents him from being executed. *Id.* at 487.

**{¶102}** In its lengthy analysis, the Sixth Circuit paid considerable attention to the decision of this court in *State v. Hill*, 177 Ohio App.3d 171, 2008-Ohio-3509 (11th Dist.) It found that this court misapplied the law regarding adaptive deficits, and misread the record regarding Hill's adaptive deficits. *Hill v. Anderson*, 881 F.3d, at 492-501.[8]

**{¶103}** In *In re Guardianship of Weller*, 2d Dist. Montgomery No. 24337, 2011-Ohio-5816, ¶7, the court stated:

**{¶104}** "'The doctrine of mootness is rooted in the "case" or "controversy" language of Section 2, Article III of the United States Constitution and in the general notion of judicial restraint.' *James A. Keller, Inc. v. Flaherty* (1991), 74 Ohio App.3d 788, 791, * * *. 'While Ohio has no constitutional counterpart to Section 2, Article III, the courts of Ohio have long recognized that a court cannot entertain jurisdiction over a moot question.' *Id.* 'It has been long and well established that it is the duty of every judicial tribunal to decide actual controversies between parties legitimately affected by

8. I respectfully note that the Sixth Circuit cites to this writer's dissent in *Hill*, 177 Ohio App.3d 171, for which this writer received a storm of public attacks, with approval. *Hill v. Anderson*, 881 F.3d at 500.

32

specific facts and to render judgments which can be carried into effect. It has become settled judicial responsibility for courts to refrain from giving opinions on abstract propositions and to avoid the imposition by judgment of premature declarations or advice upon potential controversies.' *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 14, * * *. In other words, an issue is moot when it has no practical significance, being instead merely hypothetical or academic." (Parallel citations omitted.)

{¶105} I admit the issues presented in the appeal before us, and those presented to the Sixth Circuit. Further, the State of Ohio might petition the United States Supreme Court for certiorari regarding the Sixth Circuit's decision. Pursuant to U.S. Sup.Ct. Rule 13(1), petitions for certiorari must be filed within 90 days of the date the lower court's decision becomes final. The Sixth Circuit denied the state's motion for rehearing en banc in *Hill v. Anderson* April 9, 2018, which means the state has until July 9, 2018 to petition the U.S. Supreme Court. [9] A further 60 days can be provided on a showing of good cause. U.S. Sup.Ct. Rule 13(5).

{¶106} But, otherwise, unless and until the United States Supreme Court reverses the decision of the Sixth Circuit, any decision this court renders has no practical significance.

{¶107} Again, I would dismiss this appeal as moot.

{¶108} I dissent.

---

9. The 90 day period actually concludes July 8, 2018, which, however, is a Sunday.